UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MERCEDES L. NORRIS,
　　　Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
　　　Defendant.

Case No. 1:15-cv-362
Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Mercedes L. Norris brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying plaintiff's applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI"). This matter is before the Court on plaintiff's statement of

errors (Doc. 9), the Commissioner's response in opposition (Doc. 15), and plaintiff's reply

memorandum (Doc. 16).

**I. Procedural Background**

Plaintiff filed her applications for DIB and SSI in January 2010, alleging disability since

December 31, 2009 due to major depression, fibromyalgia, hypothyroidism, asthma/allergies,

herpes simplex II, obesity, edema, acid reflux disease, osteoarthritis, and panic disorder. After

initial administrative denials of her claim, plaintiff was afforded a hearing before administrative

law judge ("ALJ") Amelia Lombardo on August 4, 2011. The ALJ denied benefits in a decision

dated September 22, 2011. Upon further review, the Appeals Council vacated the decision and

remanded the case for further proceedings. A second administrative hearing was held before

ALJ Lombardo on August 27, 2013. Plaintiff and a vocational expert ("VE") appeared and

testified at the ALJ hearing. On February 12, 2014, the ALJ issued a decision denying plaintiff's

DIB and SSI applications. Plaintiff's request for review by the Appeals Council was denied,
making the ALJ's February 12, 2014 decision the final administrative decision of the
Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable
physical or mental impairment that can be expected to result in death or that has lasted or can be
expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A)
(DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the
work previously performed or in any other substantial gainful employment that exists in the
national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation
process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or
mental impairment – *i.e.*, an impairment that significantly limits his or her
physical or mental ability to do basic work activities – the claimant is not
disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the
listings in Appendix 1 to Subpart P of the regulations and meets the duration
requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her
past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not
disabled. If the claimant cannot make an adjustment to other work, the claimant
is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

**B. The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2014.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since December 31, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971, *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: fibromyalgia, morbid obesity, and affective disorder with depressive and anxiety features (but only until December 1, 2011) (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. From the alleged disability onset date until December 1, 2011, the [plaintiff] had the residual functional capacity [("RFC")] to perform light work as defined at 20 CFR 404.1567(b) and 416.967(b) subject to the following additional limitations: essentially unskilled duties involving low stress (i.e., no assembly-line production quotas or fast-paced duties).

6. From the alleged disability onset date until December 1, 2011, the [plaintiff] was unable to perform past relevant work (20 CFR 404.1565 and 416.965).[1]

7. The [plaintiff] was born [in] . . . 1959. From the alleged disability onset date to the present the [plaintiff] was between the ages of 50 and 54. She is classified as an individual who is "closely approaching advanced age" for Social Security purposes (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and two years of college credits with an associate's degree as a paralegal (20 CFR 404.1564 and 416.964).

9. From the alleged disability onset date until December 1, 2011, the [plaintiff] did not have "transferable" work skills within the meaning of the Social Security Act (20 CFR 404.1568 and 416.968).

10. From the alleged disability onset date of December 31, 2009, until December 1, 2011, considering the [plaintiff's] age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[2]

11. By December 1, 2011, the [plaintiff] had experienced medical improvement in her condition and she no longer had a "severe" mental impairment.

12. By December 1, 2011, the [plaintiff's] residual functional capacity had increased. She had regained the capacity to perform the full range of light work as defined at 20 CFR 404.1567(b) and 416.967(b).

13. Commencing December 1, 2011, and continuing through the date of this decision, the [plaintiff] could have performed any of her past relevant work (20 CFR 404.1520(f) and 416.920(f)).

14. The [plaintiff] was not "disabled," as defined in the Social Security Act, from December 31, 2009, through the date of this decision (20 CFR 404.1520(f) and (g) and 416.920(f) and (g)).

(Tr. 17-32).

---

[1] Plaintiff's past relevant work was as a buyer and paralegal, both light exertion, skilled positions; and as a legal secretary, a sedentary, skilled position. (Tr. 29, 298).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light occupations such as a rental clerk (980 jobs locally, 85,588 jobs nationally), cafeteria attendant (881 jobs locally, 115,471 jobs nationally), and a housekeeping cleaner (1,919 jobs locally, 256,016 jobs nationally). (Tr. 30, 60-61).

**C. Judicial Standard of Review**

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

On appeal, plaintiff argues the RFC formulated by the ALJ failed to accommodate supported limitations resulting from her mental impairments, obesity, and fibromyalgia. Next,

5

plaintiff argues the ALJ erred by relying on the opinions of the non-examining state consultative physicians and not giving controlling weight to the opinion of plaintiff's treating physician, Dr. Robles. Further, plaintiff argues the ALJ erred in assessing plaintiff's credibility, subjective complaints, and pain. Finally, plaintiff contends the ALJ failed to pose a hypothetical to the VE that accurately accounted for her mental and physical impairments. (Doc. 9).

### 1. Substantial evidence does not support the ALJ's decision to give no weight to the treating physician's opinions.

Whether the ALJ properly weighed Dr. Robles's medical opinions directly impacts whether the ALJ properly evaluated plaintiff's fibromyalgia and obesity in formulating plaintiff's RFC. Thus, the Court will consider plaintiff's assignments of error concerning Dr. Robles's opinions and plaintiff's fibromyalgia and obesity together.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic

techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p, 1996 WL 374188 at *5 (1996)). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

Plaintiff received treatment from primary care physician Rosa Robles, M.D., from September 2004 through March 2010. (Tr. 489-548). Dr. Robles diagnosed fibromyalgia in September 2004, noting positive trigger points over plaintiff's back and upper extremities. (Tr.

7

533). Dr. Robles prescribed Cymbalta for plaintiff's fibromyalgia in October 2005. (Tr. 524). In April 2007, Dr. Robles noted that plaintiff was complaining of diffuse joint pains and had gained 31 pounds in 1 month. (Tr. 508). Dr. Robles continued plaintiff on Cymbalta and trazodone for her fibromyalgia. (*Id.*). In July 2007, Dr. Robles continued plaintiff on her current medications, noting that her fibromyalgia and asthma were stable. (Tr. 503). In December 2007, Dr. Robles noted plaintiff's complaints of pain all over. (Tr. 499). She prescribed Lyrica for plaintiff's fibromyalgia. (*Id.*). Later that month, Dr. Robles noted that plaintiff's fibromyalgia was better with an increased dosage of Lyrica. (Tr. 498).

In March 2008, Dr. Robles noted the following positive trigger points: "subscapular, arms (deltoids), thighs, back, etc." (Tr. 497). Dr. Robles indicated that plaintiff's complaint of increased fatigue was likely secondary to a fibromyalgia flare up. (*Id.*). In July 2008, Dr. Robles noted that plaintiff's fibromyalgia was better with meloxicam (a nonsteroidal anti-inflammatory drug). (Tr. 496). In February 2010, Dr. Robles prescribed Zoloft and Savella for plaintiff's fibromyalgia. (Tr. 493). In March 2010, plaintiff's BMI was 51. (Tr. 492). Dr. Robles noted that plaintiff's fibromyalgia responded to Savella and she prescribed Symbicort for plaintiff's asthma. (*Id.*).

Dr. Robles completed an opinion concerning plaintiff's medical condition after her March 2010 appointment. (Tr. 490-91). Dr. Robles reported plaintiff's diagnoses as major depression, fibromyalgia, fatigue, allergic asthma, gastroesophageal reflux disease ("GERD"), panic disorder, and arthritis involving mainly back problems. (Tr. 490). Dr. Robles also indicated that plaintiff was morbidly obese and was very short of breath with mild exertion. Further, Dr. Robles indicated that plaintiff had difficulty concentrating and felt fatigued. (*Id.*). Dr. Robles indicated that plaintiff's medications provided some relief but that her conditions were not controlled. (Tr. 491). As to work limitations, Dr. Robles opined that plaintiff was

8

unable to concentrate, follow directions, or keep on task. Further, plaintiff was unable to sit or walk for 30 minutes at a time due to joint pains. (*Id.*).

Dr. Robles completed a functional capacity evaluation in January 2011. (Tr. 728-31). Dr. Robles indicated that during an eight-hour workday, plaintiff could sit for one hour, could stand or walk for zero hours, must lie down for two hours, and must elevate her legs for two hours. (Tr. 728). Dr. Robles opined that during an eight-hour workday, plaintiff could lift up to five pounds for eight hours, six to ten pounds for six hours, 11 to 15 pounds for three hours, and 15 to 20 pounds for one hour. Further, plaintiff could carry up to five pounds for six hours, six to ten pounds for four hours, 11 to 15 pounds for two hours, and 15 to 20 pounds for zero hours. (*Id.*). Plaintiff could reach for three hours, handle for five hours, and finger for six hours. (Tr. 729). Dr. Robles opined that in a workday, plaintiff could stoop for 30 minutes, kneel for 45 minutes, and crouch for 30 minutes. (Tr. 730). Dr. Robles stated that plaintiff had continuous back pain and was unable to flex or extend her neck and arms. (*Id.*). Dr. Robles concluded that plaintiff would be absent more than four days per month because of her conditions or treatment. (Tr. 731).

The ALJ viewed Dr. Robles's opinions with "considerable skepticism" and gave them "no weight whatsoever." (Tr. 26). The ALJ found that Dr. Robles's opinions were "neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record." (*Id.*). The ALJ determined that "[t]he extent of impairment described by Dr. Robles could only be based on uncritical acceptance of the claimant's subjective complaints." (*Id.*). Further, the ALJ concluded that "[t]reatment records do not document any objective findings that would substantiate the degree of functional limitation found to exist by Dr. Robles." (*Id.*). Specifically, the ALJ noted that Dr. Robles's physical examinations of plaintiff revealed normal gait and full range of motion in the neck, and

did not refer "to any type of impairment that would restrict [plaintiff's] capacity to sit, stand, walk, lift, push or pull to the extent indicated by Dr. Robles." (*Id.*). The ALJ asserted that Dr. Robles's opinions concerning plaintiff's need to lie down, elevate her legs, and miss more than four days of work per month were "purely speculative and cannot be credited." (*Id.*). The ALJ found that plaintiff's ability to clean her garage and work with pictures "belie[d] the extent of limitation described by Dr. Robles." (*Id.*).

Plaintiff contends the ALJ erred in weighing Dr. Robles's opinions. (Doc. 9 at 9-10). Plaintiff argues the ALJ improperly based her decision to give no weight to Dr. Robles's opinions on a lack of objective medical findings, which is "an erroneous standard to apply toward fibromyalgia." (*Id.* at 10). Plaintiff argues the ALJ erred in giving great weight to the opinions of non-examining state agency physicians who rendered their opinions without reviewing 300 pages of medical records submitted after their opinions, which were relevant to the severity of plaintiff's fibromyalgia and obesity. (*Id.*). Plaintiff contends that her isolated activities of cleaning her garage and working with pictures did not show an ability to sustain work activity for 40 hours a week, especially as each of these attempts at isolated activity required follow-up medical treatment. (*Id.* at 10-11). Plaintiff argues the ALJ failed to give good reasons for rejecting Dr. Robles's opinions. (*Id.* at 11).

The Commissioner responds that the ALJ provided good reasons for discounting Dr. Robles's opinion, i.e., a lack of objective medical evidence, no contemporaneous treatment records that supported the severity of limitations, and inconsistency with the rest of the record evidence. (Doc. 15 at 14-16). The Commissioner argues that Dr. Robles had "an extremely limited treatment relationship with Plaintiff during the relevant period, and in fact had stopped treating her at the time she completed the opinion." (*Id.* at 16). The Commissioner contends the ALJ did not err in relying on the opinions of the non-examining consultative physicians—even

though those physicians did not review later records—because plaintiff "does not point to any evidence of worsening from these later records." (*Id.* at 17).

Here, the ALJ's rejection of the opinions of Dr. Robles "stems from [the ALJ's] fundamental misunderstanding of the nature of fibromyalgia." *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861 (6th Cir. 2011) (citing *Rogers*, 486 F.3d at 243). Specifically, in finding that Dr. Robles's opinions were "neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record," the ALJ focused on objective evidence, noting that plaintiff's physical examinations revealed normal gait and full range of motion in the neck. (Tr. 26). However, these objective indicators would not be expected in the typical case of fibromyalgia. Instead, "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers*, 486 F.3d at 243 (citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) (noting that objective tests are of little relevance in determining the existence or severity of fibromyalgia)). "Rather, fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have a full range of motion.'" *Id.* at 244 (quoting *Preston*, 854 F.2d at 820). *See also Kalmbach*, 409 F. App'x at 861-62. Thus, the lack of objective evidence in the record does not constitute substantial evidence to support the ALJ's rejection of the opinions of Dr. Robles as to the limitations attributable to plaintiff's fibromyalgia.

Instead, the Sixth Circuit has instructed that "[t]he process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." *Rogers*, 486 F.3d at 244 (citing *Preston*, 854 F.2d at 820; *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp.2d 986, 990 (N.D. Ohio 2003)). Under this process, Dr. Robles properly diagnosed plaintiff's fibromyalgia. Dr.

Robles noted that plaintiff was positive for focal points for tenderness in her back and arms in September 2004. (Tr. 533). In March 2008, Dr. Robles noted the following positive trigger points: "subscapular, arms (deltoids), thighs, back, etc." (Tr. 497). Further, Dr. Robles ordered blood tests that could rule out other possible conditions. (*See* Tr. 497, 518). Thus, there is no support in the record for the ALJ's rejection of Dr. Robles's opinions based on a lack of objective evidence.

Further, plaintiff's treatment records support Dr. Robles's opinions. As already noted, plaintiff was positive for focal points for tenderness at appointments with Dr. Robles in September 2004 and March 2008. (Tr. 497, 533). Dr. Robles noted that plaintiff was complaining of diffuse joint pains in April 2007 and of pain all over in December 2007. (Tr. 499). In March 2008, Dr. Robles noted increased fatigue secondary to fibromyalgia. (Tr. 497). In June 2010, plaintiff reported pain throughout her body at University Hospital. (Tr. 658). Physical examination at University Hospital in December 2010 revealed multiple sites of muscle pain related to fibromyalgia. (Tr. 808). At a June 2011 appointment at University Hospital, plaintiff reported pain everywhere from fibromyalgia. (Tr. 817). Also in June 2011, plaintiff's new primary care physician, Madhu Kosaraju, M.D., noted that plaintiff's fibromyalgia had "been acting up lately [with] aches all over." (Tr. 740). Plaintiff reported increased muscle and joint pains for which medication did not help in August 2011. (Tr. 855).

Plaintiff's doctors also tried numerous medications in treating her fibromyalgia. Dr. Robles initially treated plaintiff's fibromyalgia with Cymbalta and trazodone. (*See* Tr. 508, 524). In July 2007, Dr. Robles noted that plaintiff's fibromyalgia was stable on her current medications. (Tr. 503). However, in December 2007, Dr. Robles began plaintiff on Lyrica, noting plaintiff's renewed complaints of diffuse pain. (Tr. 499). Later that month, Dr. Robles noted that plaintiff's fibromyalgia was better with an increased dosage of Lyrica. (Tr. 498). In

July 2008, Dr. Robles noted that plaintiff's fibromyalgia was better with meloxicam. (Tr. 496). However, in February 2010, Dr. Robles switched plaintiff's fibromyalgia prescriptions to Zoloft and Savella. (Tr. 493). A month later, Dr. Robles noted that plaintiff's fibromyalgia had responded to Savella. (Tr. 492). In November 2010, Dr. Kosaraju also noted that Savella was helping with plaintiff's muscle pains. (Tr. 762). However, in June 2011, Dr. Kosaraju prescribed Lyrica because plaintiff's fibromyalgia had "been acting up lately [with] aches all over." (Tr. 740-41). In August 2011, Dr. Kosaraju increased plaintiff's Lyrica dosage from 50 milligrams once a day to 75 milligrams twice a day. (*See* Tr. 855-56). In January 2012, Dr. Kosaraju increased plaintiff's Lyrica dosage to 150 milligrams twice a day. (Tr. 848).

These treatment records support Dr. Robles's opinion that plaintiff's medications provided some relief but her condition was not controlled. (*See* Tr. 491). Further, these treatment records could support Dr. Robles's opinions concerning the limitations that plaintiff's fibromyalgia pain could cause. (*See* Tr. 491, 728-31). Moreover, these treatment records do not support the ALJ's finding that Dr. Robles's opinions were not "consistent with other substantial evidence in the case record." (Tr. 26).

The ALJ also failed to properly consider the effects of plaintiff's morbid obesity in rejecting Dr. Robles's opinions and formulating plaintiff's RFC. The Sixth Circuit has recognized that an ALJ must "consider the claimant's obesity, in combination with all other impairments, at all stages of the sequential evaluation." *Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 959 (6th Cir. 2015) (quoting *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009)). "Obesity is a complex, chronic disease characterized by excessive accumulation of body fat." SSR 02-1P, 2002 WL 34686281, at *2. "It must be considered throughout the ALJ's determinations, 'including when assessing an individual's residual functional capacity,' precisely because 'the combined effects of obesity with other impairments

can be greater than the effects of each of the impairments considered separately.'" *Shilo*, 600 F.

App'x at 959 (quoting SSR 02-1P, 2002 WL 34686281, at *1).

> SSR 02-1P offers detailed guidance on how to assess obesity in conjunction with other impairments. *See Norman v. Astrue*, 694 F. Supp.2d 738, 741-42 (N.D. Ohio 2010) ("this is more than a requirement that the ALJ mention the fact of obesity in passing . . ."). There are three levels of obesity that correlate with BMI levels. The highest level is Level III, which occurs when a claimant's BMI is equal to or greater than 40. It is considered "'extreme' obesity and represent[s] the greatest risk for developing obesity-related impairments." SSR 02-1P, 2002 WL 34686281, at *2. Obesity "commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems." *Id.* at *3. For example, "someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." *Id.* at *6. The ALJ also must specifically take into account "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment," and consider how "fatigue may affect the individual's physical and mental ability to sustain work activity" . . . . *Id.* at 6.

*Shilo*, 600 F. App'x at 959. In *Shilo*, the Sixth Circuit concluded that an ALJ's consideration of

a claimant's obesity was inadequate where the ALJ only observed the claimant's weight, listed

obesity as a severe impairment, and made the "bare statement" that "obesity has been considered

in combination with the back condition." *Id.* at 962. The Sixth Circuit also faulted the ALJ for

not considering the effect of a Level III BMI: "Shilo's ability to ambulate also should have been

considered in the context of Shilo's [BMI]—a disturbing 53.7 where the cut-off for Level III

obesity is 40." *Id.*

Here, Dr. Robles noted in her March 2010 opinion that plaintiff was morbidly obese and

was very short of breath with mild exertion. (Tr. 490). Dr. Robles further opined that plaintiff

was unable to sit or walk for 30 minutes at a time due to joint pains. (Tr. 491). Dr. Robles's

medical records also linked plaintiff's obesity to her other medical conditions. For example, in

April 2007, Dr. Robles noted that plaintiff was complaining of diffuse joint pains and had gained

31 pounds in one month. (Tr. 508). Further, plaintiff consistently presented with a BMI well

beyond the 40-BMI threshold for Level III obesity. *See* SSR 02-1P, 2002 WL 34686281, at *2. In March 2010, plaintiff's BMI was 51 (301 pounds). (Tr. 492). A physician at University Hospital confirmed plaintiff's diagnosis of morbid obesity and opined that her musculoskeletal conditions prevented her from standing for extended periods of time without pain. (Tr. 653-54). Dr. Kosaraju started plaintiff on medically supervised low calorie diets, but these were unsuccessful in reducing plaintiff's weight. (*See* Tr. 752-53, 762-63). By April 2012, plaintiff's BMI had increased to 59 (344 pounds). (Tr. 839). In May 2012, plaintiff underwent gastric bypass surgery. (*See* Tr. 837, 880). After this surgery, plaintiff initially lost some weight, resulting in a reduction of her BMI to 50.5 (294 pounds) in November 2012. (Tr. 831). However, by August 2013, plaintiff's BMI had increased to 54.9 (320 pounds). (Tr. 951).

There is no indication that the ALJ considered any of this evidence in formulating plaintiff's RFC. (*See* Tr. 24-29). Instead, the ALJ only noted plaintiff's BMI in finding her morbid obesity to be a severe impairment. (Tr. 18). This limited analysis of plaintiff's obesity was inadequate. *See Shilo*, 600 F. App'x at 959, 962; SSR 02-1P, 2002 WL 34686281, at *1. Further, there is no indication that the ALJ gave any consideration to plaintiff's BMI of 54.9 more than a year after gastric bypass surgery, "where the cut-off for Level III obesity is 40." *Shilo*, 600 F. App'x at 962. The ALJ should have taken this "disturbing" BMI into account in considering plaintiff's ability to stand, sit, walk, and "perform routine movement and necessary physical activity within the work environment." *Id.* at 959, 962; SSR 02-1P, 2002 WL 34686281, at *6.

Additionally, the ALJ failed to give "good reasons" for rejecting the opinions of plaintiff's treating physician. *See Cole*, 661 F.3d at 937; *Wilson*, 378 F.3d at 544. In addition to the improper focus on the lack of objective evidence to support Dr. Robles's opinions, the ALJ also found that plaintiff's ability to clean her garage and work with pictures "belie[d] the extent

of limitation described by Dr. Robles." (Tr. 26). This refers to Dr. Kosaraju's notations that plaintiff's knee pain in March 2011 started after she "was cleaning her garage and hurt her left knee" and her elbow pain in August 2011 started after she "was working with pictures all day long." (Tr. 855). However, these stray citations picked out from plaintiff's medical records do not provide any context that might shed light on how significant these activities were, i.e., how comparable they would be to the sustained light exertion work that the ALJ found plaintiff was able to do in the ALJ's RFC formulations. (*See* Tr. 24, 31). *See also Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (noting the ALJ "was selective in parsing the various medical reports"); *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."). Moreover, the ALJ does not explain how discrete injuries to plaintiff's elbow and knee on two separate occasions are relevant in discounting Dr. Robles's opinions concerning the limitations attributable to the diffuse and persistent muscle and joint pain caused by plaintiff's fibromyalgia and obesity. Further, these citations to plaintiff's cleaning the garage and working with pictures do not constitute substantial evidence that plaintiff was capable of performing work-like activities. If anything, these citations in plaintiff's medical record constitute evidence that she was unable to perform activities like this without requiring medical attention in the aftermath. The ALJ's description of these activities "fails to examine the physical effects coextensive with their performance," i.e., the need for medical care. *Rogers*, 486 F.3d at 248-49. Thus, plaintiff's unsuccessful attempts on two occasions in the record to clean her garage and work with pictures do not constitute substantial evidence for rejecting the opinions of Dr. Robles.

Moreover, the ALJ failed to properly assess the regulatory factors in assessing the weight to give the treating physician's opinions. *See* 20 C.F.R. § 404.1527(c)(2)-(6). Under these

16

factors, Dr. Robles's opinions are deserving of significant, if not controlling, weight. Unlike the non-examining physicians who only reviewed a portion of plaintiff's records, Dr. Robles had a longstanding treating relationship with plaintiff and examined her frequently. *See* 20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Rogers*, 486 F.3d at 244; *Wilson*, 378 F.3d at 544. Further, as already explained above, the opinions of Dr. Robles are consistent with the record as a whole and supported by the medical evidence. *See* 20 C.F.R. § 404.1527(c)(3)-(4); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. Because the ALJ failed to conduct this evaluation or "provide sufficient justification for the weight given to the opinions of [plaintiff's] treating physician, [the ALJ's] decision in this regard did not meet the requirements of 20 C.F.R. § 416.927, and therefore cannot serve as substantial evidence." *Rogers*, 486 F.3d at 246 (citing *Wilson*, 378 F.3d at 544).

Rather than relying on the opinions of plaintiff's treating physicians, the ALJ gave great weight to the opinions of the non-examining state agency physicians, Dr. Teague and Dr. Das, who opined that plaintiff was capable of light work. (Tr. 26-27). Yet, neither Dr. Teague nor Dr. Das "are treating physicians, a fact of special significance given the unique nature of fibromyalgia." *Rogers*, 486 F.3d at 245. Neither of them performed a physical exam, while treating physician Dr. Robles and examining physicians at University Hospital, who frequently examined plaintiff during the relevant period, rendered opinions that could support a finding that she "would be unable to maintain full-time employment." *Id.*; (*see* Tr. 490-91, 653-54, 728-31). Further, the state agency physicians offered their opinions without the benefit of all the records from the relevant period, including the records of University Hospital and Dr. Kosaraju, which show that plaintiff's fibromyalgia was a problem consistently noted and treated by multiple treating sources. (*See* Tr. 619-24, 727). *See also Rogers*, 486 F.3d at 245 & n.4 (noting the "importance of a non-examining source having a complete medical snapshot when reviewing a

claimant's file"). One factor the ALJ must consider in weighing medical opinions is "the extent to which an acceptable medical source is familiar with the other information in [the] case record." 20 C.F.R. § 404.1527(c)(6). A state agency reviewing doctor's opinion may be entitled to greater weight than that of a treating or examining doctor in certain circumstances, such as when the "State agency medical . . . consultant's opinion is based on a review of a complete case record that . . . provides more detailed and comprehensive information than what was available to the individual's treating source." *Blakley*, 581 F.3d at 409 (quoting SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996)). However, where a non-examining source has not reviewed a significant portion of the record and the ALJ fails to indicate that she has "at least considered [that] fact before giving greater weight" to the reviewing doctor's opinion, the ALJ's decision cannot stand. *Blakley*, 581 F.3d at 409 (internal quotation omitted). Thus, substantial evidence does not support the ALJ's decision to give great weight to the opinions of the non-examining sources.

Accordingly, plaintiff's assignments of error should be sustained as to the opinions of Dr. Robles and this matter should be reversed and remanded for further proceedings. On remand, the ALJ should be instructed to reassess plaintiff's RFC, giving appropriate weight to the opinions of Dr. Robles concerning the work limitations associated with plaintiff's fibromyalgia and obesity.

> **2. Substantial evidence supports the ALJ's evaluation of plaintiff's mental impairments before December 1, 2011, but does not support the ALJ's evaluation of plaintiff's mental impairments after that date.**

Plaintiff argues the ALJ erred in formulating plaintiff's RFC for the period from December 2009 until November 2011 because the RFC did not properly account for moderate limitations in concentration, persistence, or pace. (Doc. 9 at 4-5). Plaintiff contends the ALJ further erred in determining that her mental impairments were no longer severe after December

1, 2011, based on plaintiff's failure to seek continuing mental health therapy. (*Id.* at 5). Plaintiff argues that her GAF score when she resumed treatment in August 2013 was consistent with her GAF scores prior to December 2011. (*Id.*). Further, plaintiff contends her continued prescriptions for drugs for depression and anxiety after December 2011 show that her mental health conditions remained severe. (*Id.*).

The Commissioner responds that the ALJ reasonably considered the gaps in plaintiff's mental health treatment as one factor to support finding that plaintiff's symptoms were not as severe as alleged. (Doc. 15 at 7). The Commissioner argues that any error in not finding plaintiff's mental impairments to be severe after December 2011 was harmless because even with the pre-December 2011 RFC, plaintiff would not be disabled. (*Id.* at 8). The Commissioner contends the ALJ's pre-December 2011 RFC "adequately convey[ed] a moderately limited ability to maintain concentration, persistence, or pace" under Sixth Circuit caselaw. (*Id.* at 9).

In reply, plaintiff argues the Commissioner erred "in failing to note that [the consulting psychologist] found a number of 'moderate' work-related limitations on his exam which were not in the ALJ's mental residual functional capacity." (Doc. 16 at 1).

"[A]n impairment is considered 'severe' unless 'the [claimant's] impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 324 (6th Cir. 2015) (quoting Soc. Sec. Ruling 85-28, 1985 WL 56856, at *3 (1985)). The Sixth Circuit has "observed that the claimant's burden of establishing a 'severe' impairment during the second step of the disability determination process is a '*de minimis* hurdle.'" *Id.* at 324-25 (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "Under [this] prevailing *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* at 325 (quoting *Higgs*, 880 F.2d at 862).

The ALJ determined that plaintiff's affective disorder with depressive and anxiety features was a severe impairment, but only until December 1, 2011. (Tr. 18). The ALJ relied on the May 2010 opinion of the consultative examining psychologist, David Chiappone, Ph.D., that plaintiff was moderately impaired in her ability to understand, remember, and follow instructions; mildly impaired in her ability to maintain attention, persistence, and pace; mildly impaired in her ability to relate to others; and moderately impaired in her ability to cope with the stress and pressures associated with daily work activity. (Tr. 20, 596). The ALJ noted that at a psychiatric appointment on December 1, 2011, plaintiff's "mental condition was stable with no adverse side effects from treatment or medication." (Tr. 20). For the pre-December 2011 period, the ALJ found that plaintiff had moderate limitations in her ability to maintain concentration, persistence, or pace. (Tr. 22). Based on plaintiff's mental impairments during this period, the ALJ restricted her to "essentially unskilled duties involving low stress (i.e., no assembly-line production quotas or fast-paced duties)." (Tr. 24, 27). However, the ALJ concluded that after December 1, 2011, there was medical improvement in plaintiff's mental condition such that her ability to maintain concentration, persistence, or pace was only mildly limited. (Tr. 22). The ALJ noted plaintiff's lack of mental health treatment after December 1, 2011 as further evidence of medical improvement. (Tr. 27). Thus, the ALJ eliminated the RFC restriction to unskilled duties involving low stress from December 2011 onward. (Tr. 31).

Plaintiff sought mental health treatment at Mental Health and Recovery Centers in February 2010. (Tr. 551). Plaintiff reported that she was seeking treatment to help with increased anxiety and feelings of depression. Her goal in seeking treatment was to "get healthy" and "let go and live" her own life. (*Id.*). Plaintiff was taking sertraline (i.e., Zoloft) for her depression. (Tr. 554). She reported that she had previously taken Cymbalta and Prozac for depression but those prescriptions were discontinued because they were not working. (*Id.*). She

20

described stress due to financial and family issues. (Tr. 557). On mental status examination, plaintiff was found to be mildly depressed and moderately anxious. (Tr. 559, 562). Plaintiff's depression symptoms included "feeling depressed every day almost all day with increased depression in the morning, decreased motivation and desire to engage in enjoyable activities, sleep disturbances, appetite disturbances, and lethargy." (Tr. 559). Plaintiff's anxiety symptoms included "panic attacks and off and on experience of generalized anxiety." (*Id.*). Plaintiff was diagnosed with major depressive disorder, recurrent and alcohol dependence in full sustained remission. (Tr. 564). Plaintiff was assigned a GAF score of 51.[3] (*Id.*).

In July 2010, psychiatrist Emad Alshami, M.D., saw plaintiff. (*See* Tr. 626-29). Plaintiff reported a history of depression for at least 30 years that was progressively getting worse. (Tr. 626). Plaintiff reported multiple stressors, including unemployment and financial problems. Plaintiff reported symptoms of irritability, mood swings, anxiety, low self-esteem, poor attention, and poor concentration. (*Id.*). On mental status examination, plaintiff was found to have a severely depressed mood, severe irritability, moderate anxiety, and an affect that was moderately restricted and moderately flat. (Tr. 628). Dr. Alshami diagnosed plaintiff with major depressive disorder, recurrent-moderate and assigned a GAF score of 55. (*Id.*). Dr. Alshami discontinued plaintiff's prescription for Zoloft, noting that it was not effective. (Tr. 629). Instead, Dr. Alshami prescribed Pristiq. (*Id.*).

At appointments in October and November 2010 and February and May 2011, Dr. Alshami reported that plaintiff's mood/affect was "brighter" and she was doing better on Pristiq.

---

[3] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. Individuals with GAF scores of 51 to 60 have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

(*See* Tr. 961, 963, 965, 967). However, in October 2011, Dr. Alshami reported that plaintiff's mood/affect was depressed, she reported feeling anxious, and was not responding to Pristiq. (Tr. 959). Dr. Alshami discontinued plaintiff's prescription for Pristiq and prescribed Lexapro. (*Id.*). On December 1, 2011, Dr. Alshami reported that plaintiff's mood/affect was good/pleasant and she reported feeling okay. (Tr. 957). Dr. Alshami continued plaintiff on Lexapro. (*Id.*).

Plaintiff was discharged from treatment in February 2012 after canceling three therapy appointments. (*See* Tr. 1003-04). Plaintiff returned to treatment in August 2013. (*See* Tr. 969). Plaintiff reported that in the interim, she "just didn't feel like coming." (*Id.*). Plaintiff reported that after gastric bypass surgery in 2012, she initially lost 50 pounds. However, she had since gained all the weight back and realized "she's never going to fix her body until she fixes her mind." (*Id.*). Plaintiff reported symptoms of depression, chronic pain, anxiety, impulsivity, and mood swings. (*Id.*). She was taking Celexa for her depression. (Tr. 971). On mental status examination, plaintiff's affect was constricted and her mood was moderately depressed and mildly anxious. (Tr. 984).

Dr. Chiappone examined plaintiff for disability purposes in May 2010. (Tr. 592-97). Plaintiff complained of pain, trouble concentrating, depression, and anxiety. (Tr. 592). On mental status examination, Dr. Chiappone noted that plaintiff was an overweight woman who "walked slowly and . . . appeared to be in pain sitting for duration." (Tr. 594). Dr. Chiappone opined that plaintiff "did not appear to exaggerate or minimize her complaints." Plaintiff complained of feeling depressed, had decreased energy, made some depressive statements, and was "a bit pessimistic." (*Id.*). She rated her depression as an eight on a ten-point scale. Plaintiff had lost interest in most activities, had daily crying spells, but denied current suicidal ideation. Plaintiff stated that her future looked "not good" and indicated that she felts "hopeless, helpless, and worthless." (*Id.*). Dr. Chiappone noted that plaintiff "appeared tense, she complained of

feeling anxious and she seemed unnerved in being evaluated." (Tr. 595). Plaintiff rated her anxiety as an eight on a ten-point scale. Plaintiff had daily panic attacks, chest pain, shortness of breath, shakiness, sweats, feelings of weakness, and frequent nightmares. Plaintiff's "concentration, attention, and memories appeared to be generally adequate" and she did not appear to be malingering. (*Id.*).

Dr. Chiappone opined that plaintiff's ability to understand, remember, and follow instructions was moderately impaired. Dr. Chiappone found that plaintiff's "memory is adequate but she would have difficulty following instructions over time." (*Id.*). Dr. Chiappone noted mild impairment in plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks. While Dr. Chiappone found that plaintiff was able to focus during the evaluation, he opined that "she would have difficulty persisting over time due to depression and anxiety." (*Id.*). Dr. Chiappone opined that plaintiff was mildly impaired in her ability to relate to others, noting that "she might have some difficulty dealing with give and take." (*Id.*). Dr. Chiappone found that plaintiff was moderately impaired in her ability to withstand the stress and pressures associated with day-to-day work activity due to depression and anxiety. (*Id.*). Dr. Chiappone diagnosed plaintiff with pain disorder due to both psychological factors and general medical condition (depression and anxiety). (Tr. 597). Dr. Chiappone assigned plaintiff a GAF score of 48.[4]

In November 2012, Dr. Kosaraju noted plaintiff's diagnosis of generalized anxiety disorder with symptoms of apprehension, shortness of breath, and tachycardia several times a day. (Tr. 831). Dr. Kosaraju prescribed Vistaril (antihistamine with anxiolytic, anti-obsessive, and antipsychotic properties) and continued plaintiff on Celexa. (Tr. 832). In February 2013,

---

[4] Individuals with GAF scores of 41 to 50 have "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 34.

plaintiff was still taking Celexa and Vistaril. (Tr. 829). Dr. Kosaraju noted that plaintiff was

"doing well on Celexa." (*Id.*). In January 2014, plaintiff was taking Celexa and Buspar

(anxiolytic used to treat generalized anxiety disorder). (Tr. 1016).

Substantial evidence supports the ALJ's assessment of plaintiff's mental condition from

December 31, 2009 through November 30, 2011. The ALJ's RFC for that time period

adequately accounted for Dr. Chiappone's opinions concerning plaintiff's functional limitations.

The restriction to low stress work is directly responsive to Dr. Chiappone's finding that plaintiff

was moderately impaired in her ability to withstand the stress and pressures associated with day-

to-day work activity. (*See* Tr. 24, 27, 596). Further, this RFC restriction—essentially unskilled

duties involving low stress (i.e., no assembly-line production quotas or fast-paced duties)—also

adequately conveyed plaintiff's moderately limited ability to maintain concentration, persistence,

or pace. *See Kepke v. Comm'r of Soc. Sec.*, __ F. App'x __, 2016 WL 124140, at *9-*10 (6th

Cir. 2016) (rejecting plaintiff's argument that ALJ's hypothetical limiting plaintiff to simple,

unskilled work in a low stress job was insufficient to convey moderate limitations in

concentration, persistence, and pace); *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426,

437 (6th Cir. 2014) ("[T]he limitation to simple, routine, and repetitive tasks adequately conveys

[plaintiff's] moderately limited ability 'to maintain attention and concentration for extended

periods.'"). Thus, substantial evidence supports the ALJ's pre-December 2011 assessment of

plaintiff's mental RFC.

However, substantial evidence does not support the ALJ's determination that plaintiff no

longer suffered from a severe mental impairment after December 2011. Plaintiff's "burden of

establishing a 'severe' impairment during the second step of the disability determination process

is a '*de minimis* hurdle.'" *Winn*, 615 F. App'x at 324-25. The record as a whole shows that

plaintiff's anxiety and depression remained more than a "slight abnormality" having more than a

"minimal effect" on her work abilities. *See id.* Contrary to the ALJ's finding that plaintiff did

not seek mental health treatment after December 1, 2011, the record shows that plaintiff

continued to treat with Dr. Kosaraju after that time. (Tr. 829, 831-32, 1016). Dr. Kosaraju's

records show that plaintiff's mental condition had not improved to the degree that the ALJ

inferred from Dr. Alshami's December 2011 treatment note. For example, in November 2012,

Dr. Kosaraju diagnosed plaintiff with generalized anxiety disorder causing symptoms of

apprehension, shortness of breath, and tachycardia several times a day. (Tr. 831). In addition to

maintaining plaintiff's Celexa prescription, Dr. Kosaraju prescribed Vistaril, which has anti-

anxiety, anti-obsessive, and antipsychotic properties. (Tr. 832). In January 2014, Dr. Kosaraju

noted that plaintiff was taking Celexa and Buspar, an anti-anxiety medication used to treat

generalized anxiety disorder. (Tr. 1016). Further, plaintiff resumed treatment at Mental Health

and Recovery Centers in August 2013. (Tr. 969). At that time, plaintiff still reported serious

mental health symptoms, including depression, chronic pain, anxiety, impulsivity, and mood

swings. (*Id.*). On mental status examination, plaintiff's affect was constricted and her mood was

moderately depressed and mildly anxious. (Tr. 984). Thus, substantial evidence does not

support the ALJ's finding that plaintiff's mental health conditions had stabilized in December

2011 such that she no longer suffered from a severe mental impairment.

The Commissioner argues that even if the ALJ erred in finding that plaintiff no longer

suffered from a severe mental impairment after December 2011, the error was harmless. (Doc.

15 at 8). The Commissioner would be correct if plaintiff's post-December 2011 RFC were the

same as the ALJ's pre-December 2011 RFC. However, as noted above in the discussion

concerning Dr. Robles's opinion and plaintiff's fibromyalgia and obesity, the ALJ must reassess

plaintiff's RFC on remand, giving appropriate weight to the opinions of Dr. Robles concerning

the work limitations associated with plaintiff's fibromyalgia and obesity. Thus, because the ALJ

may assess additional limitations on remand attributable to plaintiff's fibromyalgia and obesity, the failure to include limitations after December 2011 related to plaintiff's mental impairment would not necessarily be harmless. Accordingly, plaintiff's assignment of error should be sustained as to the ALJ's assessment of her mental limitations after December 1, 2011. On remand, the ALJ should be instructed to reassess plaintiff's mental RFC for the relevant period, giving consideration to all the evidence of record.

### 3. The Court need not reach plaintiff's assignment of error concerning the ALJ's assessment of her credibility, subjective complaints, and pain.

It is not necessary to address plaintiff's argument that the ALJ improperly assessed her credibility, subjective complaints, and pain because the ALJ's reconsideration of this matter on remand may impact the remainder of the ALJ's sequential analysis, including the assessment of plaintiff's credibility. *See Trent v. Astrue*, No. 1:09-cv-2680, 2011 WL 841538, at *7 (N.D. Ohio Mar. 8, 2011). In any event, even if this assignment of error had merit, the result would be the same, i.e., remand for further proceedings and not outright reversal for benefits. *Mays v. Comm'r of Soc. Sec.*, No. 1:14-cv-647, 2015 WL 4755203, at *13 (S.D. Ohio Aug. 11, 2015) (Report and Recommendation) (Litkovitz, M.J.), *adopted*, 2015 WL 5162479 (S.D. Ohio Sept. 3, 2015) (Dlott, J.).

### 4. Whether the ALJ presented improper hypotheticals to the VE.

As discussed above, substantial evidence does not support the ALJ's rejection of the opinions of plaintiff's treating physician or the ALJ's RFC assessment. Consequently, the hypothetical questions presented to the VE do not properly reflect plaintiff's impairments and/or limitations. Accordingly, the ALJ erred by relying on this vocational testimony to carry her burden at step five of the sequential evaluation process. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789 (6th Cir. 2009) (ALJ erred in relying on answer to hypothetical question

because it simply restated RFC that did not accurately portray claimant's impairments). Because the ALJ's hypothetical questions failed to accurately portray plaintiff's impairments, the VE's testimony in response to those hypotheticals does not constitute substantial evidence that plaintiff could perform the work identified by the VE. Therefore, plaintiff's assignment of error should be sustained and this matter should be reversed and remanded with instructions to the ALJ to provide a hypothetical question to the VE that accurately portrays plaintiff's fibromyalgia, obesity, and mental impairments as determined by the ALJ after giving proper weight to the opinion evidence and formulating a consistent RFC.

**III. This matter should be reversed and remanded for further proceedings.**

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the undersigned notes that all essential factual issues have not been resolved in this matter. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). On remand, the ALJ should (1) reassess plaintiff's RFC, giving appropriate weight to the opinions of Dr. Robles concerning plaintiff's fibromyalgia and obesity; (2) reassess plaintiff's credibility, subjective complaints, and pain in light of the nature of fibromyalgia, the opinions of Dr. Robles, and the complete medical record concerning plaintiff's fibromyalgia, obesity, and mental impairments; and (3) pose an appropriate hypothetical or hypotheticals to a VE once the ALJ has completed a proper assessment of plaintiff's RFC that accounts for all of plaintiff's limitations during the relevant period.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further

proceedings consistent with this opinion.

Date:   5/6/16

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MERCEDES L. NORRIS,                          Case No. 1:15-cv-362
      Plaintiff,                          Dlott, J.
                                           Litkovitz, M.J.

  vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).